## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-1681

MARCO PAREDES-MACHADO

Plaintiff,

v.

UNITED STATES OF AMERICA

UNITED STATES DEPARTMENT OF JUSTICE;

FEDERAL BUREAU OF PRISONS;

CRAIG WININGER, Assistant United States Attorney;

SETH GILMORE, Assistant United States Attorney;

JOHN DOE #1 – #10, Department of Justice employees;

MICHAEL CARVAJAL, Director, Federal Bureau of Prisons;

M. FACEY, ADX Transfer Hearing Administrator, Bureau of Prisons;

JOHN DOE #11 – #20, Bureau of Prisons employees;

Defendants.

---

## COMPLAINT AND JURY DEMAND

---

## INTRODUCTION

1.     The United States Constitution prohibits the use of torture to coerce an individual to talk. Yet this is exactly what the government did to Marco Paredes-Machado. Treating him vastly differently from all similarly situated inmates, the government first orchestrated his torture by Mexican authorities and then later ensured his confinement under the harshest prison conditions in

existence in America, all to try to get him to give the government information. Mr. Paredes-Machado brings this lawsuit to seek redress from these heinous violations.

2.      For decades, the United States has been engaged in prosecuting individuals associated with international drug trafficking organizations. United States agents, in their quest to dismantle drug trafficking organizations such as the Sinaloa Cartel, have resorted to extrajudicial techniques including torture or "enhanced interrogation" to involuntarily coerce cartel members to inform on their higherups.

3.      In the early 2000s, the Drug Enforcement Agency ("DEA") identified Mr. Paredes-Machado as a person the DEA believed had direct information about the inner workings of the Sinaloa Cartel. The DEA identified Mr. Paredes-Machado as a Sinaloa Cartel "plaza boss."

4.      Plaza bosses are not the leaders of cartels. Within cartel hierarchy, plaza bosses are akin to regional distribution managers, *i.e.*, middle management. Plaza bosses maintain a degree of control within their region, but they lack power anywhere else. Plaza bosses do, however, have access to organizational information. The acquisition of information from the middle echelons of a cartel's hierarchy is a significant part of intelligence gathering for U.S. drug investigations.

5.      On November 9, 2005, the United States charged Mr. Paredes-Machado with conspiracy to distribute more than 1,000 kilograms of marijuana. Charging Mr. Paredes-Machado served two purposes. First, this indictment provided authority to the United States to arrest and extradite Mr. Paredes-Machado. Second, and more germane to the United States' ambitions of dismantling the Sinaloa Cartel, having Mr. Paredes-Machado in custody provided the United States an opportunity to try to extract intelligence on the Sinaloa Cartel and rival organizations that a plaza boss like Mr. Paredes-Machado would know.

6.      At the time the United States charged Mr. Paredes-Machado, he was living in Mexico. To bring him into custody, the DEA, with the assistance of a United States Ambassador to Mexico, devised a scheme to effectuate Mr. Paredes-Machado's arrest with the assistance of the Mexican Secretaría de Seguridad y Protección ("SSP") and Mexican special operations police authorities. This plan involved tactics including using black pillowcases as hoods, setting up a black site for torture, and putting together a series of scripts that the SSP would use in coerced confession videos made to be shared with the DEA and Department of Justice ("DOJ").

7.      After years of trying to find Mr. Paredes-Machado, the DEA and its Mexican counterparts eventually located him in Mexico City. On January 11, 2011, at the behest of American officials, SSP officers arrested Mr. Paredes-Machado and his wife. After being placed in custody, Mr. Paredes-Machado and his wife were driven to a government building and both had black pillowcases placed over their heads. This building was used as black site where Mexican officers, acting on the authority of and with the knowledge and complicity of American officials, beat Mr. Paredes-Machado, tortured him, waterboarded him, and threatened to rape his wife unless he agreed to provide intelligence to U.S. authorities about the Sinaloa Cartel.

8.      The SSP officers, working as agents of the DEA, coerced Mr. Paredes-Machado into providing information. SSP officers rehearsed questions and coerced answers from Mr. Paredes-Machado. SSP officers flogged him, kneed him, and threatened him if he did not follow the script they provided. Once Mr. Paredes-Machado's torturers were satisfied that Mr. Paredes-Machado would give a videotaped confession that the DEA would want, the SSP officers filmed his scripted coerced confession. The SSP officers then contacted their DEA counterparts and had the DEA agents meet them at the black site to further interrogate a now-broken, recently tortured, and emotionally exhausted Mr. Paredes-Machado.

9. Years after Mr. Paredes-Machado's arrest, after prolonged detention in Mexico, Mr. Paredes-Machado was extradited to the United States. Here, after he pleaded guilty and was sentenced, he would be forced to endure a different form of torture: complete isolation from the world at the Administrative Maximum Security Supermax prison in Florence, Colorado: ADX.

10. When Mr. Paredes-Machado first arrived in the United States, he spent several years litigating his criminal case in the federal courts. During the pendency of his case, various United States Attorneys tried to arrange a meeting with Mr. Paredes-Machado to ask him about the intricacies of the Sinaloa Cartel and its leader, Joaquín Guzmán, also known as "El Chapo." Mr. Paredes-Machado agreed to hear out the government and listen to its questions, but after hearing them, Mr. Paredes-Machado declined to speak with the government.

11. Once Mr. Paredes-Machado was convicted, United States Attorneys made representations to him that they would consider postconviction leniency if Mr. Paredes-Machado agreed to speak with them. Mr. Paredes-Machado agreed to hear out the government to find out what information it wanted so he could decide whether he was interested in providing it.

12. In the days leading up to the scheduled meeting, the Defendants decided that to get the information it wanted from Mr. Paredes-Machado, they needed more leverage. The Defendants thus concocted a plan: before any government agent would meet with Mr. Paredes-Machado, the government would have him transferred to the harshest, most restrictive prison in the country, the ADX Supermax facility in Florence, CO. The goal of this plan was to coerce Mr. Paredes-Machado to talk with the government in exchange for a potential transfer out of ADX.

13. To execute this plan, instead of producing Mr. Paredes-Machado for the scheduled meeting, Defendants transferred him a different facility far away. The United States Attorneys, who had previously offered a possible sentence reduction in exchange for information, then reneged on

their offer. Instead, they collaborated with other employees of the DOJ and BOP to have Mr. Paredes-Machado placed in conditions sufficiently horrific to coerce him to give information in exchange for being transferred to a minimum-security detention facility.

14.     As a result of the Defendants' machinations, Mr. Paredes-Machado, a man who up until that point was classified as a low security risk and was bound for placement at FCI Safford, a low security prison, was rerouted to ADX. The government accomplished this through a bizarre ADX transfer hearing where Mr. Paredes-Machado's was accused of being a member of the notorious terrorist organization ISIS, the Islamic State in Iraq and Syria. The ADX transfer report falsely alleged that Mr. Paredes-Machado had pledged allegiance to ISIS, had an ISIS tattoo on his back, and posed a threat to others, thereby justifying his transfer to ADX.

15.     After exhaustive attempts to administratively appeal the erroneous findings at this fixed ADX hearing, the BOP conceded that Mr. Paredes-Machado was in fact not the ISIS member described in the ADX transfer report. However, rather than reclassify Mr. Paredes-Machado as the low security risk he actually was, the BOP arbitrarily determined that Mr. Paredes-Machado was "notorious," a designation the BOP then used to justify transferring him to ADX.

16.     Having now designated Mr. Paredes-Machado in the amended ADX transfer report and recommendation as "notorious," the BOP ordered that he be incarcerated at ADX.

17.     No similarly situated cartel member under the jurisdiction of the BOP has received the "notorious" designation that Mr. Paredes-Machado received. No plaza boss has been shipped off to ADX. Mr. Paredes-Machado constitutes a class of one, singled out for draconian punishment for no purpose other than to coerce him into speaking to the United States government.

18.     Only after breaking Mr. Paredes-Machado down through prolonged solitary confinement did the United States government finally arrange to speak to him.

19.     The factual allegations that follow describe the extreme lengths the United States government took to coerce Mr. Paredes-Machado to waive his First Amendment rights not to speak as well as the fact that the United States singled him out for treatment vastly different from that of similarly situated prisoners. For both these reasons, the government's treatment of Mr. Paredes-Machado was unconstitutional and must be remedied by this Court.

## JURISDICTION & VENUE

20.     The first three causes of action in this case constitute a civil rights action for declaratory relief, injunctive relief, and relief in the nature of mandamus, brought pursuant to 5 U.S.C. § 702, for violations of Mr. Paredes-Machado's constitutional rights, as further authorized by the Supreme Court in *Bell v. Hood*, 327 U.S. 678 (1946), and its progeny.

21.     This Court possesses subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), 1346, 2201-02, and 1361.

22.     Venue for these causes of action is proper in the District of Colorado pursuant to 28 U.S.C. §§ 1391(b) and (e).

23.     The fourth cause of action in this case is brought under the Freedom of Information Act, 5 U.S.C. § 552. This Court has both subject matter and personal jurisdiction over the parties pursuant to 5 U.S.C. § 552(a)(4)(B). The Court also has jurisdiction over this cause of action under 28 U.S.C. § 1331, 1336, 2201-02, and 1361.

24.     Venue for this cause of action is proper in the District of Colorado under 5 U.S.C. § 552(a)(4)(B).

## PARTIES

25.     Plaintiff Marco Paredes-Machado is a resident of the State of Colorado, incarcerated at the ADX Supermax facility in Florence, Colorado.

26.     Defendant United States of America is the federal government of the country. It is responsible for and authorizes the actions of the Department of Justice and the Bureau of Prisons, including all decisions concerning where Mr. Paredes-Machado is incarcerated and all decisions concerning whether to change where Mr. Paredes-Machado is incarcerated.

27.     Defendant United States Department of Justice is a federal executive department tasked with the enforcement of federal law and is responsible for the prosecution of criminal defendants in federal court. The DOJ is responsible for deciding which criminal defendants and prisoners the United States will seek to speak with, which defendants the United States will offer consideration in exchange for having provided information deemed helpful to the United States, and under what conditions and at what times the United States will engage in such discussions.

28.     Defendant Federal Bureau of Prisons is a federal law enforcement agency that is a subdivision of the DOJ. It is responsible for the incarceration of people convicted of federal criminal violations who are sentenced to a term of incarceration. The BOP is responsible for assigning and transporting federal prisoners to its various facilities. The BOP is also responsible for releasing federal prisoners, whether due to the end of the inmate's sentence or through early release.

29.     At all times relevant to this Complaint, Defendant Craig Wininger was an Assistant United States Attorney. Defendant Wininger was one of the prosecutors responsible for the prosecution of Mr. Paredes-Machado.

30.     At all times relevant to this Complaint, Defendant Seth Gilmore was an Assistant United States Attorney. Defendant Gilmore was a DOJ official with responsibilities related to the investigation and prosecution of significant drug traffickers.

31.     Defendants John Doe #1 – #10 are as-yet unidentified employees of the DOJ.

32.     Defendant Michael Carvajal, is the Director of the United States Bureau of Prisons and is responsible for the day-to-day operation of the agency, including the designation, transfer, and release of inmates in the Bureau's custody, and is further responsible for agency compliance with regulatory, statutory, and constitutional mandates. He is sued in his official capacity.

33.     Defendant M. Facey was a Hearing Administrator at USP Big Sandy, Kentucky at the times relevant to the Complaint. He was responsible for conducting ADX transfer hearings, designating prisoners for ADX, and was further responsible for agency compliance with regulatory, statutory, and constitutional mandates.

34.     Defendants John Doe #10 – #20 are as-yet unidentified employees of the BOP.

## FACTUAL ALLEGATIONS

### The DEA's Quest to Dismantle the Sinaloa Cartel

35.     The DEA began investigating Mr. Paredes-Machado for drug trafficking in the early 2000s. The DEA viewed Mr. Paredes-Machado as a player within the Sinaloa Cartel's hierarchy and believed he would have information the United States government sought. To the government, Mr. Paredes-Machado was a person of such interest that the United States would break laws and rely on torture to try to get him to speak about the inner workings of the cartel.

36.     For years, the DEA pursued Mr. Paredes-Machado. It labelled him a "plaza boss" based in Agua Prieta, Mexico.

37.     Plaza bosses are middle-level players within a cartel. They are responsible for distribution from a limited and localized region, or "plaza." Plaza bosses are middle management. A plaza boss is analogous to a regional manager at a corporation.

38.     Although plaza bosses do not occupy the upper echelons of cartel hierarchy and do not have authority over other plazas, plaza bosses periodically interact with higher ranking members regarding regional distribution activities.

39.     Because of this, the DEA identified Mr. Paredes-Machado as a valuable potential source of information about the Sinaloa Cartel's organizational structure and operations.

40.     The DEA believed that Mr. Paredes-Machado was close to cartel members such as Benjamin Leopoldo Jaramillo-Feliz (a.k.a. "Nene"); Julian Aguirre-Aguirre (a.k.a. "Censio"); and Manuel Avendano (a.k.a. "El Meno"), alleged members of the Sinaloa Cartel's upper echelons.

41.     The DEA's hope was to crack Mr. Paredes-Machado and thereby move the United States one step closer to bringing down Joaquín Archivaldo Guzmán Loera – then the head of the Sinaloa Cartel, the Mexican Drug Lord known as "El Chapo."

42.     On November 9, 2005, the United States obtained a Sixth Superseding Indictment against Mr. Paredes-Machado charging him with conspiracy to distribute more than 1,000 kilograms of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846 and conspiracy to import more than 1,000 kilograms of marijuana in violation of 21 U.S.C. §§ 952(a), 960 and 963.

43.     Charging Mr. Paredes-Machado gave the United States government an opportunity to not only remove Mr. Paredes-Machado, through the process of extradition, from the world of international drug trafficking and into the jurisdiction of the Department of Justice, but also – the government hoped – to learn about a cartel that has been in the United States crosshairs since the government turned its attention away from Colombia and towards Mexico in the mid-1990s.

44.     Though the United States obtained an indictment against Mr. Paredes-Machado, the DOJ faced two immediate obstacles in going after Mr. Paredes-Machado and the Sinaloa Cartel. First, Mr. Paredes-Machado lived in Mexico and the United States would need to work closely with

9

Mexican authorities to get Mr. Paredes-Machado to the United States to face charges. Second, Mr. Paredes-Machado's potential usefulness to the United States government's greater investigations was predicated upon the government being able to get him to speak to its agents.

45.     Within the Sinaloa Cartel culture, speaking to and cooperating with the government is a death sentence. If cartel members learned that Mr. Paredes-Machado spoke to the government about their operations, they would kill both him and his family.

46.     The government is aware of the threat to people who cooperate with the Government. For example, Pedro Flores and Margarito Flores, both of whom worked with the government in their case against El Chapo, are in witness protection for their own safety. Further, the wives of the Flores' twins are also living under assumed names for their own protection due to their husbands' cooperation against El Chapo.

47.     Understanding this reality, the United States government knew that Mr. Paredes-Machado, even if apprehended, would likely refuse to speak to American government agents.

48.     At the same time, the United States government also knew that Mexican authorities regularly engaged in interrogation techniques amounting to torture, which the American government viewed (correctly or incorrectly) as effective in coercing recalcitrant prisoners to provide information.[1]

---

[1] *See e.g.*, U.S. Dep't of State, Bureau of Democracy, Human Rights and Labor, Country Reports on Human Rights Practices for 2009, https://2009-2017.state.gov/j/drl/rls/hrrpt/2009/wha/136119.htm (detailing allegations known to U.S. government of killings by Mexican government security forces, and an increase in complaints involving cruel or degrading treatment and torture in 2009 as compared to 2008, few of which resulted in punishment); *see also* U.S. Dep't of State, Bureau of Democracy, Human Rights and Labor, Country Reports on Human Rights Practices for 2014, 4-5, https://2009-2017.state.gov/documents/organization/236914.pdf (discussing the hundreds of complaints of torture received and the report of the United Nations Special Rapporteur for Torture, who observed that torture of detainees usually occurred within hours after arrest).

<u>Mr. Paredes-Machado's Arrest in Mexico</u>

49.     With this knowledge, in May of 2010, the United States Embassy requested that the Mexican government detain Mr. Paredes-Machado for the purpose of extradition.

50.     DEA special agents Shankweiler and Thompson were assigned to locate Mr. Paredes-Machado in Mexico.

51.     Agents Shankweiler and Thompson worked with Mexican officials to obtain information about Mr. Paredes-Machado's activities, assets, and physical location to effectuate his arrest and commence extradition to the United States for the 2005 drug conspiracy charges.

52.     DEA agents and agents of the Mexican Secretaría de Seguridad y Protección (SSP), a federal law enforcement agency in Mexico, conducted coordination meetings with the assistance of the Hermosillo Resident Office to plot Mr. Paredes-Machado's arrest and plan his interrogation.

53.     By September of 2010, the DEA obtained a telephone number of a phone that agents believed Mr. Paredes-Machado possessed.

54.     The DEA then provided this phone number to the Mexican SSP for further exploitation, along with funding support for an "intel T-III" on that number.

55.     On information and belief, "intel T-III" is a term used to refer to a wiretap that is requested and funded by the United States government, but is carried out by foreign government authorities, here, by the government of Mexico.

56.     Months passed. The DEA was unable, even with this information, to locate Mr. Paredes-Machado.

57.     Around December of 2010, the United States, through its Embassy in Mexico, became further involved in the DEA's quest to locate and arrest Mr. Paredes-Machado.

58.     On December 7, 2010, Mr. Joseph E. Evans of the United States Embassy in Mexico sent a letter to Mr. Irving Barrios Mojica, head of the Mexican Attorney General's Special Money Laundering Investigation Unit.

59.      In that letter, Mr. Evans stated that the DEA office in Hermosillo, Sonora, had been assisting the SSP to locate and arrest Mr. Paredes-Machado. It also stated that in the previous months the DEA had also been assisting the Mexican government in locating properties belonging to Mr. Paredes-Machado, whom they characterized as a "fugitive" awaiting capture on a Detroit arrest warrant.

60.     The letter identified 18 different parcels of land that the United States government wanted the Mexican authorities to investigate, stated that Special Agent Jonathan Shankweiler had already provided further details, and indicated that photos of the properties had been attached.

61.     The DEA continued analyzing call records from the suspected phone they believed to be in Mr. Paredes-Machado's possession.

62.     Collaborating with Mexican authorities, the DEA identified another number they believed to be associated with Mr. Paredes-Machado, one they believed belonged to Mr. Paredes-Machado's wife, Rosa Icela Ponce de Paredes.

63.      On December 14, 2010, DEA agents requested that the SSP initiate an intel T-III on that phone, and again submitted U.S. funding for it to the Mexican authorities. As a result, agents were able to eavesdrop on calls made from the telephone of Ms. Icela Ponce de Paredes and learned that she had scheduled a medical appointment at a hospital in Mexico City on January 11, 2011, and that Mr. Paredes-Machado would be at that appointment with her.

64.     The DEA and SSP then devised and coordinated a plot to arrest Mr. Paredes-Machado and his wife at the hospital.

65.     This plot included a plan of what to do with Mr. Paredes-Machado and his wife while the two of them were in the custody of Mexican authorities.

66.     On January 11, 2011, a detachment of SSP personnel in plain clothes and unmarked police cars staked out the hospital.

67.     Among the detachment were eight to ten Mexican federal agents who identified themselves as working with the Subprocuraduría Especializada en Investigación de Delincuencia Organizada, (SEIDO) which is the organized-crime division of Mexico's Attorney General's Office.

68.     Within a few hours, the agents arrested Mr. Paredes-Machado and his wife.

69.     The agents informed Mr. Paredes-Machado that he was being arrested at the behest of the United States government due to an extradition warrant from the United States.

70.     Mr. Paredes-Machado was arrested solely pursuant to this extradition warrant from the United States in the Eastern District of Michigan. There was no other reason for Mr. Paredes-Machado to be detained besides the American warrant.

71.     The agents placed Mr. Paredes-Machado and his wife in separate police vehicles.

72.     The agents ordered both Mr. Paredes-Machado and his wife to keep their heads down so they could not see where they were being taken.

73.     That same day, the SSP Drug Commander Ramon Eduardo "Pequeno" Garcia informed Mr. Carlos Mitchem, DEA Assistant regional Director for North and Central America, that Mr. Paredes-Machado had been arrested, that he and his wife were now in the custody of the Mexican government, and that the United States government would have the opportunity to interrogate them outside of the United States.

<u>The Mexican Government Tortured Mr. Paredes-Machado at the Behest of the United States Government</u>

74.     The agents who arrested Mr. Paredes-Machado at the behest of the United States government drove him and his wife to the offices of the PFP (Policia Federal Preventitiva), a federal police force under the Mexican Secretary of the Interior, "Los Federales."

75.     When they arrived at PFP, agents escorted Mr. Paredes-Machado into the building, shuffling him into a room where agents placed a black pillowcase over Mr. Paredes-Machado's head and handcuffed Mr. Paredes-Machado with his hands behind his back.

76.     An agent told Mr. Paredes-Machado in a loud voice that he would need to cooperate with interrogators, and that if he didn't answer their questions satisfactorily, his wife would be tortured and sexually assaulted.

77.     Mr. Paredes-Machado will never forget what the agent threated: "Si no cooperas tu señora le va llevar a la chingada y ahorita vas a ver como va a gritar." This can be politely translated as: "If you don't cooperate there will be horrible consequences for your woman, and soon you will see how she will scream."

78.     The agents began questioning Mr. Paredes-Machado about who was in charge of the Agua Prieta, Sonora "plaza."

79.     Blinded by the black pillowcase hooding his head, Mr. Paredes-Machado was unable to see who was interrogating him.

80.     Mr. Paredes-Machado heard different voices and believed that two or three different persons were present.

81.     The interrogators then asked about which cartel Mr. Paredes-Machado worked for.

82.     Mr. Paredes-Machado repeated, "I work for myself."

83.     The interrogators began slapping Mr. Paredes-Machado in the back of the head.

84.     They then began threatening that there would be more severe punishment if Mr. Paredes-Machado didn't speak.

85.     The threats included statements such as, "Si no hablas por las buenas vas a hablar por las malas," meaning if you don't cooperate, we will make you cooperate one way or another.

86.     Eventually the interrogators decided that Mr. Paredes-Machado was not saying what they wanted him to say.

87.     Mr. Paredes-Machado was not making statements that would assist the United States government in its operations against the Sinaloa Cartel. He did not discuss Leopoldo Jaramillo-Feliz, he did not discuss Aguirre-Aguirre, he did not discuss Avendano, and he did not discuss El Chapo.

88.     The interrogators were not deterred. They instead moved onto harsher methods to make Mr. Paredes-Machado talk.

89.     "Stand up!" one interrogator ordered, before grabbing Mr. Paredes-Machado and walking him to a new room.

90.     Mr. Paredes-Machado heard a door close. Seconds later, someone removed Mr. Paredes-Machado's shirt. Mr. Paredes-Machado remained hooded.

91.     An interrogator punched Mr. Paredes-Machado in the stomach several times and threw him on the floor.

92.     Mr. Paredes-Machado heard one interrogator tell another, "Tráeme la camilla!" Translation: "Get me the gurney!"

93.     Interrogators forced Mr. Paredes-Machado onto the gurney face-up with his hands cuffed behind his back. One of the interrogators then sat on his legs. Another jammed a knee into his stomach causing him to expel all the air out of his lungs.

94.     Simultaneously, another interrogator poured water over the hood on Mr. Paredes-Machado's mouth causing Mr. Paredes-Machado to involuntarily swallow and inhale water and experience the sensation of drowning. They waterboarded him.[2]

95.     The Mexican authorities continued to torture Mr. Paredes-Machado. This torture was done at the behest and with the knowledge of American government officials with the goal to extract information that the United States was bent on obtaining.

96.     After seven or eight repetitions of waterboarding, one of the interrogators told Mr. Paredes-Machado that his wife was being interrogated in the same fashion. The interrogator told Mr. Paredes-Machado that he could stop her suffering by providing information about the cartel.

97.     Mr. Paredes-Machado believed that both he and his wife would be killed if he did not cooperate. Mr. Paredes-Machado then agreed to tell the interrogators what they wanted to hear.

98.     The interrogators seated Mr. Paredes-Machado in a chair.

99.     Mr. Paredes-Machado began to feel a sensation of deep relaxation and calmness as if he was floating on clouds. The interrogators likely administered a sedative or other similar drug to further induce Mr. Paredes-Machado to talk.

100.    The interrogators told Mr. Paredes-Machado that all they wanted was for him to talk about the cartel's organizational structure.

---

[2] Waterboarding is torture. *See e.g.*, Hon. Evan Wallach, Drop by Drop: Forgetting the History of Water Torture in U.S. Courts, 45 Colum. J. Transnat'l L. 468 (2007) (describing the horrific effects of waterboarding, and the convictions for war crimes of Japanese soldiers who employed it in World War II). In waterboarding, the water flows into the victim's sinuses, which causes severe physical suffering in the form of reflexive choking, gagging, and the feeling of suffocation. The process prevents the victim from drawing breath, and causes panic, and terror of imminent death. Many victims of waterboarding suffer prolonged mental harm for years and even decades afterward. Human Rights Watch, Open Letter to Attorney General Alberto Gonzales (April 5, 2006), https://www.hrw.org/news/2006/04/05/open-letter-attorney-general-alberto-gonzales.

101.    They told him that they wanted to know about Sinaloa Cartel higherups like Arturo Beltran, Juan Esparagoza, Hector Beltran, Tony Beltran, and El Chapo.

102.    Interrogators instructed Mr. Paredes-Machado as to what they wanted him to say. Among other things, he was told to say that he was present at a "father of cartel leaders" meeting in Cuernavaca.

103.    They rehearsed the questions. Under threat of further torture for both him and his wife, Mr. Paredes-Machado answered the questions with the information he had been told to say.

104.    After rehearsing the questions and answers, interrogators put Mr. Paredes-Machado's shirt back on him. They then placed a now unhooded Mr. Paredes-Machado in front of a camera.

105.    During the taped portion of the interrogation, the interrogators stopped the video two or three times to repeat the questions and make Mr. Paredes-Machado give answers they found more acceptable.

106.    During the recording, if Mr. Paredes-Machado strayed from the rehearsed answers, one of the interrogators would slap him on the back of his head. Another interrogator would then restart the recording from the beginning to ensure that Mr. Paredes-Machado spoke the exact words the authorities wanted him to say.

107.    Having tortured Mr. Paredes-Machado into providing a video statement, the Mexican authorities took him to another room to give a written statement.

108.    Sometime around 2:30 a.m. on January 12, 2011, Mexican authorities brought Mr. Paredes-Machado before an attorney of the special money laundering unit. There, Mr. Paredes-Machado was questioned by another official, Paula Montserrat Amador Hernandez.

109.    Ms. Montserrat Amador Hernandez obtained a written statement that revealed that Mexican authorities questioned Mr. Paredes-Machado about the same properties listed in the letter

Mr. Evans of the United States embassy had sent to the Mexican government approximately a month before Mr. Paredes-Machado's arrest, demonstrating their close coordination.

110. Next, a Mexican Officer who gave his name as "Jorge Hernandez" transported Mr. Paredes-Machado to the SEIDO office.

111. Several United States agents arrived at SEIDO to further interrogate Mr. Paredes-Machado. They were identified as DEA agents from Detroit, Michigan; Sierra Vista, Arizona; and Hermosillo, Sonora.

112. The agents questioned Mr. Paredes-Machado about El Chapo and the Sinaloa Cartel.

113. They wanted him to cooperate with the United States government by providing information about the organizational structure of the Sinaloa Cartel.

114. Mr. Paredes-Machado, no longer strapped to a gurney being waterboarded while simultaneously afraid his was enduring either the same torture or government sanctioned rape, declined to speak to the United States government about El Chapo or the Sinaloa Cartel.

115. Over the next four years, Mr. Paredes-Machado languished in a Mexican jail awaiting extradition to the United States. He refused to speak to government officials during that time.

116. On September 9, 2015, Mr. Paredes-Machado was extradited from Mexico and taken into the United States Marshals Service's custody to face the drug conspiracy charges the United States first brought against him nearly a decade before.

117. Once in the geographical jurisdiction of the United States, the government no longer disregarded Mr. Paredes-Machado's basic human and Constitutional rights so obviously in its quest to extract information.

118. However, the United States would soon devise another method to circumvent the Constitution to try to get Mr. Paredes-Machado to speak to its agents.

<u>The United States Government Punitively Transferred Mr. Paredes-Machado to ADX to Coerce
Him to Waive His First Amendment Right Not to Speak to the Government</u>

119.    Between the first arraignment in Mr. Paredes-Machado's 03-CR-80244 case and his February 5, 2020, sentencing, Mr. Paredes-Machado was represented by counsel. This representation ensured that Mr. Paredes-Machado would not again experience the degrading torture he survived at the hands of the Mexican government working at the behest of the United States.

120.    From September 9, 2015, until October 1, 2019, when Mr. Paredes-Machado entered a plea, the United States refrained from trying to coercively extract information from him.

121.    On September 30, 2019, Mr. Paredes-Machado pleaded guilty to conspiracy to distribute more than 5 kilograms of cocaine and 1,000 kilograms of marijuana for importation in violation of Title 21 U.S.C. §§ 959, 960, and 963; and conspiracy to distribute more than 1,000 kilograms of marijuana in cases 12-CR-00237 in the District of Columbia and 03-CR-80244 in the Eastern District of Michigan, respectively. Mr. Paredes-Machado's plea agreement entailed a stipulated 22-year sentence. Because he was not held in Mexico for any reason other than United States charges, under the plea he received time credit for all the time he had spent in custody, including the time spent in custody in Mexico.

122.    One of the Assistant United States Attorneys who worked on the prosecution of Mr. Paredes-Machado was Defendant Craig Wininger.

123.    On January 31, 2020, after Mr. Paredes-Machado entered the plea agreement and just 6 days before Mr. Paredes-Machado was scheduled to be sentenced, Defendant Wininger emailed Mr. Paredes-Machado's attorney asking if Mr. Paredes-Machado would be interested in talking to the government about cartel "violence occurring on or near the border."

124.    Defendant Wininger's email stated the United States was interested in speaking to Mr. Paredes-Machado and that if Mr. Paredes-Machado was willing and assisted the United States, Defendant Wininger would move to reduce Mr. Paredes-Machado's sentence.

125.    Defendant Wininger further stated that he intended to proceed to sentencing on February 5, 2020, and that should Mr. Paredes-Machado agree to speak with the United States, the details could be worked out after sentencing.

126.    On February 5, 2020, Mr. Paredes-Machado was sentenced to 22 years in prison. Because the United States warrant was the only reason he had been held in custody in Mexico, Mr. Paredes-Machado received credit against this sentence for the time he was in custody in Mexico.

127.    On February 6, 2020, Mr. Paredes-Machado's attorney contacted Defendant Wininger to inform him that Mr. Paredes-Machado would be willing to hear out the United States and consider answering the government's questions. Mr. Paredes-Machado's attorney requested that any discussions take place at the Detroit Milan facility where Mr. Paredes-Machado was then being held, and before Mr. Paredes-Machado was transferred to the BOP. This was a condition of Mr. Paredes-Machado agreeing to hear out the government.

128.    Mr. Paredes-Machado feared that should a meeting take place at the Arizona BOP facility where he was set to be transferred, regardless of whether he ultimately decided to provide information, incarcerated cartel members would find out that he had met with the government and would violently retaliate against him and his family.

129.    On February 7, 2020, the judgment in case 03-CR-80244 entered.

130.    The judge in the Eastern District of Michigan recommended that the BOP place Mr. Paredes-Machado in a BOP facility near Tucson, Arizona.

131. The BOP, led by and acting under the authority of Defendant Carvajal, classified Mr. Paredes-Machado as a low security risk.

132. The BOP designated FCI Safford in Arizona as the facility where Mr. Paredes-Machado would serve his sentence.

133. FCI Safford is a low security federal prison.

134. FCI Safford does not incarcerate prisoners classified as medium or high security.

135. On February 6, 2020, Mr. Paredes-Machado confirmed to the government through counsel that he would hear out the government and listen to its questions. However, he only agreed to consider questions concerning members of another cartel, La Linea, not his own.

136. The United States government began making arrangements for U.S. agents to speak with Mr. Paredes-Machado.

137. On February 13 and 14, 2020, Defendant Wininger emailed Mr. Paredes-Machado's attorney to schedule a meeting between Mr. Paredes-Machado and the United States government.

138. Defendant Wininger later included another Defendant on these emails, AUSA Seth Gilmore. Defendant Gilmore was included to facilitate the meeting.

139. Defendant Gilmore worked in Department of Justice's Narcotics and Dangerous Drugs Section.

140. Defendants Wininger and Gilmore scheduled a meeting with Mr. Paredes-Machado for March 10, 2020, at the Milan Detroit facility as Mr. Paredes-Machado had requested.

141. Defendant Wininger told Mr. Paredes-Machado through counsel that he arranged for the Marshals to hold Mr. Paredes-Machado in Detroit until March 10, 2020, so that the government could meet with Mr. Paredes-Machado as planned.

142.     However, this did not occur. Instead, Defendant Wininger, Defendant Gilmore, Defendants John Doe #1 – #10 at the DOJ, and Defendants John Doe #11 – #20 at the BOP created, coordinated, and executed a plan to have Mr. Paredes-Machado transferred to ADX before any meeting with the government. The goal of this plan was to establish maximum leverage for the government before the meeting to coerce Mr. Paredes-Machado into revealing information in exchange for a chance at release from the torture that is confinement at ADX.

143.     To initiate the plan, these Defendants first had Mr. Paredes-Machado transferred to a different facility instead of having him held in Michigan.

144.     To learn more about the actions of Defendants Wininger, Glimore, and John Does #1 – #20, as well as about Mr. Paredes-Machado's BOP classification prior to his transfer out of Michigan, on June 4, 2021, Mr. Paredes-Machado made a request under the Freedom of Information Act ("FOIA"). In this FOIA request, Mr. Paredes-Machado asked for "any and all information related to Mr. Paredes-Machado regarding his reclassification and present housing at ADMAX in Florence, Colorado. . . . This FOIA request is seeking all general documents related to why Mr. Paredes-Machado was moved, his classification (or, rather, re-classification) within the United States Bureau of Prisons ('BoP'), and any related information relied upon [by] the BoP in justifying his move to a more restrictive facility," among other documents.[3]

145.     On June 25, 2021, Mr. Paredes-Machado received confirmation from the BOP that it received his FOIA request.[4]

---

[3] See the FOIA request, attached as Exhibit 1, which Mr. Paredes-Machado incorporates herein.
[4] See the BOP's response letter, attached as Exhibit 2, which Mr. Paredes-Machado incorporates herein.

146.    However, more than a year later and despite a follow-up request to the BOP's FOIA liaison sent on June 1, 2022,[5] Mr. Paredes-Machado has received no substantive response to his request. He has received no documents. He has received no statement that documents will not be produced. Instead, on June 29, 2022, he received correspondence from the BOP indicating that it is "processing records" and that the BOP will "attempt to complete your FOIA request as soon as practicable." In other words, there is no deadline or expected timeframe within which the BOP will produce records or even decide whether to produce records.

147.    As a result of Defendant BOP's illegal stonewalling, which is the subject of Mr. Paredes-Machado's fourth cause of action in this case, Mr. Paredes-Machado is unable to allege further details about the inner workings of the conspiracy at present. He can only state the facts of what Defendants did to him in executing their conspiracy.

148.    As a part of the execution of their plan conceived with the assistance of John Does #1 – #20, rather than hold the meeting with Mr. Paredes-Machado on the terms the government had previously agreed to, Defendants Wininger and Gilmore cancelled the March 10, 2020 meeting.

149.    Instead of holding the meeting that had been set to occur in Michigan, without any explanation, the BOP followed the plan concocted by Defendants Wininger, Gilmore, and John Does #1 – #20, and had Mr. Paredes-Machado transferred to a federal facility in Oklahoma.

150.    This was a transfer facility, not a facility where prisoners serve out sentences. Mr. Paredes-Machado therefore knew that he would be transferred from this facility to another to serve the bulk of his sentence.

---

[5] See the FOIA correspondence, attached as Exhibit 3, which Mr. Paredes-Machado incorporates herein.

151.     On or around March 3, 2020, Defendants Wininger and Gilmore agreed to reschedule the meeting with Mr. Paredes-Machado to April 8, 2020. However, this rescheduled meeting never occurred. Instead, Defendants Wininger and Gilmore, acting in accordance with the plan they developed with John Does #1 – #20, never intended to meet with Mr. Paredes-Machado until they had gotten him transferred to ADX, at which point their leverage would be at its highest.

152.     Acting in accordance with this plan, on March 16, 2020, Defendant Wininger emailed Mr. Paredes-Machado through counsel. In that email Defendant Wininger informed counsel that Mr. Paredes-Machado "was inadvertently put on the airlift last week" and that as a result, they were unable to conduct the rescheduled meeting. He cc'd Defendant Gilmore.

153.     Defendant Wininger's emailed statement to Mr. Paredes-Machado's counsel was false. Mr. Paredes-Machado's transport via airplane to a BOP facility was not an accident. To the contrary, it represented the next step in the plan conceived by Defendants Wininger, Gilmore, and John Does #1 – #20: triggering the beginning of the government's administrative process for transferring Mr. Paredes-Machado to ADX.

154.     As evidence of this, rather than correct this supposedly inadvertent airlift and direct the U.S. Marshal to return Mr. Paredes-Machado to the Milan Detroit facility where he had agreed to hear out the United States government, Defendant Wininger emailed Mr. Paredes-Machado, through counsel, to inform him that Defendant Wininger told the U.S. Marshals that they did not need Mr. Paredes-Machado returned to the Milan Detroit Facility. He again cc'd Defendant Gilmore, keeping him appraised of each step of the execution of the conspiracy.

155.     In that email, Defendant Wininger falsely stated that the reason for the "inadvertent" transfer was that the U.S. Marshal was interested in getting Mr. Paredes-Machado to his destination facility as quickly as possible.

156.     Having successfully delayed the meeting with Mr. Paredes-Machado without triggering suspicion about their real goals and motives, Defendants Wininger, Gilmore, and John Does #1 – #20 ceased substantive communications with Mr. Paredes-Machado. Between March 16, 2020, and July 30, 2020, the United States and its employees, whether in the BOP or DOJ, did not communicate with Mr. Paredes-Machado's counsel.

157.     During that period, as a part of the plan of Defendants Wininger, Gilmore, and John Does #1 – #20, Mr. Paredes-Machado was transported from FCI Oklahoma to FCI Big Sandy in Kentucky without ever being transferred to his destination facility in Arizona.

158.     At first, while Mr. Paredes-Machado was in Oklahoma, he believed the delay in transferring him to FCI Safford was attributable to him being considered for COVID-19 parole.

159.     In May of 2020, Mr. Paredes-Machado was notified by the staff at his facility that he was eligible for COVID-19 parole. A staff member prepared the COVID-19 parole paperwork for him and had him sign it. The staff member asked Mr. Paredes-Machado for his wife's phone number to process the COVID-19 parole and he provided it.

160.     The normal channel for consideration for COVID-19 parole was separate and apart from the conspiracy involving Defendants Wininger, Gilmore, and John Does #1 – #20. Mr. Paredes-Machado's potential COVID-19 parole therefore initially went forward as any other prisoner's would have.

161.     While Mr. Paredes-Machado's criminal case progressed, Mr. Paredes-Machado's wife, Ms. Icela Ponce de Paredes, had moved to the United States.

162.     Shortly after Mr. Paredes-Machado gave the staff member at his facility his wife's phone number, the BOP interviewed her to see if Mr. Paredes-Machado could be released to her residence on home confinement.

163.     A BOP employee responsible for assessing inmates' eligibility for COVID-19 parole

spoke to Ms. Icela Ponce de Paredes about Ms. Icela Ponce de Paredes agreeing to permit Mr.

Paredes-Machado reside with her while on home confinement.

164.     Ms. Icela Ponce de Paredes agreed to allow Mr. Paredes-Machado to reside with her

while on home confinement.

165.     The BOP employee stated that she would contact Ms. Icela Ponce de Paredes to

schedule a home visit before releasing Mr. Paredes-Machado on COVID-19 parole.

166.     The BOP employee told Ms. Icela Ponce de Paredes that Mr. Paredes-Machado

would soon be released to reside with her at her home.

167.     But for the intervention of Defendants Wininger, Gilmore, and John Does #1 –

#20, this home visit would have been the final step before Mr. Paredes-Machado would have been

approved for COVID-19 parole and released to home confinement.

168.     However, instead of this happening, Mr. Paredes-Machado was never released on

COVID-19 parole.

169.     Mr. Paredes-Machado also was never transferred to FCI Safford, the low security

prison the BOP had designated for him.

170.     Instead, due to the work of Defendants Wininger, Gilmore, and John Does #1 –

#20, Mr. Paredes-Machado was transferred to FCI Big Sandy in Kentucky where he was held in

solitary confinement.

171.     Mr. Paredes-Machado arrived at Big Sandy on or around July 22, 2020.

172.     When Mr. Paredes-Machado arrived at Big Sandy he was immediately placed in the

Special Housing Unit, which entails solitary confinement.

173.     Mr. Paredes-Machado had no criminal history at the time of his sentencing.

174.     Mr. Paredes-Machado was classified as a low security prisoner.

175.     Mr. Paredes-Machado was not written up for any disciplinary sanctions during the five-month period that began after his sentencing.

176.     Mr. Paredes-Machado was not written up for any disciplinary sanctions prior to sentencing, whether in Mexico or in pre-trial detention in the United States.

177.     Mr. Paredes-Machado never received a credible threat notification from BOP informing him that prison staff received information that Mr. Paredes-Machado's well-being was under threat by another inmate.

178.     In short, no justification existed to place Mr. Paredes-Machado into a Special Housing Unit to serve his sentence in solitary confinement.

179.     Mr. Paredes-Machado was as shocked as he was confused about his unexpected placement in solitary confinement.

180.     During the five-month period between sentencing and winding up in solitary confinement, Defendants Wininger, Gilmore, and John Does #1 – #20 did not substantively communicate with Mr. Paredes-Machado. This was surprising because he had been led to believe that if he heard out the government and then decided to answer its questions he could receive a sentence reduction, and that regardless of whether he chose to answer any questions posed to him, he should have been transferred to his designated low security prison in Arizona, where he would be within 500 miles of family or released to home confinement on COVID-19 parole.

181.     On July 30, 2020, Mr. Paredes-Machado through counsel reinitiated communications with the United States government, emailing Defendants Wininger and Gilmore to inquire about the status of a meeting between them and Mr. Paredes-Machado.

182.    On August 3, 2020, Defendant Gilmore responded saying that the United States was still interested in speaking with Mr. Paredes "as soon as that is practicable." He cc'd Defendant Wininger. However, despite making this statement to Mr. Paredes-Machado's counsel, Defendant Gilmore's statement was false. In fact, Defendants Wininger, Gilmore, and John Does #1 – #20 wanted the meeting to occur only once Mr. Paredes-Machado was at ADX.

183.    This is evidenced by the fact that at literally any time, they could have reserved a conference room at whatever facility Mr. Paredes-Machado was at and met with him or set up a video conference call and done the same. They did not do either of these things because, contrary to what they were saying to Mr. Paredes-Machado's counsel, Defendants Wininger, Gilmore, and John Does #1 – #20 only wanted the meeting with Mr. Paredes-Machado to occur once he was at ADX and the government's leverage was therefore at its maximum.

184.    On August 10, 2020, the BOP generated a Summary Re-entry Plan Report for Mr. Paredes-Machado. This document stated that instead of being headed for FCI Safford, Mr. Paredes-Machado was designated for transport to the ADX Supermax prison.

185.    To accomplish this, Defendants Wininger, Gilmore, and John Does #1 – #20 had Mr. Paredes-Machado re-classified as a high security prisoner without basis.

186.    As a result, Mr. Paredes-Machado remained in solitary confinement at USP Big Sandy throughout August of 2020 while awaiting an ADX transfer hearing.

187.    On August 28, 2020, Mr. Paredes-Machado through counsel contacted Defendants Wininger and Gilmore asking if they would shed light on the reasons surrounding the decision to send a low security prisoner to ADX, the most restrictive prison facility in the United States.

188.    Defendants Wininger and Gilmore provided no information.

189.     Conditions at ADX are notoriously horrible. Indeed, the European Court of Human Rights has halted extraditions of prisoners designated for placement at the ADX Supermax Prison because its conditions violate Article 3 of the European Convention on Human Rights, which prohibits "inhuman or degrading treatment." *See Aswat v. The United Kingdom* (No. 17299/12), 2013 Eur. Ct. H.R. 17 (holding prisoner's extradition to the United States where placement in ADX was likely would be a violation of Article 3 of the Convention in light of severity of prisoner's mental health condition).

190.     On September 30, 2020, Mr. Paredes-Machado received an ADX Transfer Hearing Notice. The hearing notice was provided only in English.

191.     Mr. Paredes-Machado can speak and read only limited English.

192.     Mr. Paredes-Machado was not provided with an interpreter who could explain to him what the document he had been handed was or what it meant.

193.     The notice provided that the hearing would occur in approximately one week.

194.     On October 6, 2020, Mr. Paredes-Machado was put before a group of hearing officers without counsel or a translator.

195.     Defendant M. Facey was one of the hearing officers. He was also the Hearing Administrator. The identities of the other hearing officers are presently unknown.

196.     Due to the machinations of Defendants Wininger, Gilmore, Facey, and John Does #1 – #20, Mr. Paredes-Machado's hearing was a charade with a preordained result: transfer to ADX.

197.     Prior to the hearing, Mr. Paredes-Machado's case manager told him that the hearing was not important because no matter what was said at the hearing, he would be transferred to ADX.

198.     A psychologist at USP Big Sandy who evaluated Mr. Paredes-Machado told him the same thing: he was bound for ADX.

199.     Further, prior to the hearing, Mr. Paredes-Machado was contacted by a trustee inmate who was mopping the hall outside his solitary confinement cell. This other inmate spoke Spanish. This inmate told Mr. Paredes-Machado that according to a card that was stuck on the door of his cell, Mr. Paredes-Machado was going to be transferred to ADX.

200.     The sham hearing lasted only four minutes. While the hearing officers told Mr. Paredes-Machado that he could provide evidence, they refused him access to counsel, access to any documents, or access to a translator. Furthermore, the sham hearing took place only days after Mr. Paredes-Machado was given notice, which did not provide Mr. Paredes-Machado time to get a letter to his counsel and receive a response that would have contained evidence that would have demonstrated that he did not belong at ADX.

201.     Acting in accordance with the plan, three days after the hearing Defendant Facey submitted a report and recommendation for Mr. Paredes-Machado to be transferred to ADX.

202.     In that report, Defendant Facey wrote: "The Hearing Administrator considered the statement of the inmate Paredes-Machado, along with the other evidence presented, which is documented in this report. The Hearing Administrator could not ignore the fact that inmate Paredes-Machado has pledged his allegiance to the leader of the Islamic State of Iraq and al-Sham ('ISIS'), a designated Foreign Terrorist Organization. This is a fact the inmate made no effort to refute. This, along with the fact inmate Spain has been found to have committed three High severity category offenses in the past 60 months, meets the criteria for placement in the ADX, General Population unit." Defendant Facey also considered the "fact" that Mr. Paredes-Machado had an ISIS tattoo on his back.

203.     Mr. Paredes-Machado has no tattoos. Mr. Paredes-Machado has no ties to ISIS. Mr. Paredes-Machado has no affiliation with any designated Foreign Terrorist Organization. Mr. Paredes-Machado never committed any offense that meets the criteria for placement at ADX. Mr. Paredes-Machado never received a disciplinary write up while in the custody of the BOP. None of the justifications Defendant Facey wrote that supposedly made Mr. Paredes-Machado suitable for confinement at ADX were true.

204.     On October 31, 2020, Mr. Paredes-Machado drafted a Remedy Appeal to challenge the Hearing Administrator's findings and contest his transfer to ADX.

205.     In response, Defendant Facey amended the report to remove the prior findings that Mr. Paredes-Machado was affiliated with ISIS.

206.     In their place, Defendant Facey substituted new false allegations. He now falsely asserted that Mr. Paredes-Machado was "notorious," "second only to Joaquin 'El Chapo' Guzman" in the Sinaloa cartel. No substantive facts were provided to support these allegations.

207.     The falsity of this claim was so obvious as to be infuriating. The fact that the government would make such an obviously false claim about Mr. Paredes-Machado – one contradicted by the government's own public proclamations – provides further evidence that Mr. Paredes-Machado's ADX transfer hearing was a sham and that there was no legitimate reason for transferring Mr. Paredes-Machado to ADX. The only reason the government transferred Mr. Paredes-Machado to ADX was the unconstitutional reason laid out herein: to coerce him into speaking to the government, in violation of his rights under the First Amendment.

208.     The United States government has long known who was second in command to El Chapo in the Sinaloa Cartel: Ismael Mario Zambada-Garcia, known as "El Mayo." Based on this knowledge, the United States, acting through the DOJ, has repeatedly investigated El Mayo and has

indicted him in five separate cases spanning 2003 through 2016. As the government has stated, "With the arrest, extradition, conviction, and sentencing of fellow Sinaloa Cartel faction leader Joaquin Guzman-Loera, a/k/a Chapo Guzman, Zambada Garcia is the unquestioned senior leader of the Sinaloa Cartel."[6] The claim by Defendant Facey and the BOP that Mr. Paredes-Machado was "notorious" because he was second in command to El Chapo was a bald-faced lie and the government knew it.

209.     Nonetheless, in accordance with the plan of Defendants Wininger, Gilmore, John Does #1 – #20, and with the complicity of Defendant Facey, the BOP used Defendant Facey's freshly minted "notorious" designation to justify transferring Mr. Paredes-Machado to ADX.

210.     According to BOP guidelines, the "notorious" designation is reserved for inmates who have demonstrated an inability to function in a less restrictive environment without being a threat to others, or to the secure and orderly operation of the institution.

211.     At the time Mr. Paredes-Machado received the "notorious" designation, he had only been in BOP custody for five months. During that time, he did not receive a single write up or present any threat to others or to the secure and orderly operations of any prison.

212.     The BOP transferred Mr. Paredes-Machado to ADX on or about March 15, 2021.

213.     Mr. Paredes-Machado administratively appealed the decision to transfer him to ADX. His administrative appeals have all been denied. Mr. Paredes-Machado has remained at ADX since his transfer there.

214.     Defendants Wininger, Gilmore, and John Does #1 – #20, having now successfully executed the first step in their plan, proceeded to the second: using the leverage of potential transfer

---

[6] U.S. Dep't of State, Ismael Mario Zambada-Garcia; Narcotics Reward Program: Wanted (Sept. 23, 2021), https://www.state.gov/narcotics-rewards-program-target-information-wanted/ismael-mario-zambada-garcia/.

from ADX to a less restrictive facility coerce Mr. Paredes-Machado into talking with the government.

215.     On June 3, 2021, only once the conspirators had ensured Mr. Paredes-Machado would be imprisoned indefinitely in the county's most restrictive facility unless he spoke with them, did United States government agents show up to meet with Mr. Paredes-Machado. Only under the most drastic carceral circumstances, under which the United States government hoped Mr. Paredes-Machado would say anything to free himself, would the government meet with him.

216.     The DEA and DOJ had long considered Mr. Paredes-Machado to be a potential source of information that could assist the United States in its attempts to dismantle drug trafficking operations.

217.     Defendants knew, however, that absent coercion or torture, Mr. Paredes-Machado would not speak to government officials. So to effectuate their goals, they coerced him.

218.     In so doing, Defendants violated Mr. Paredes-Machado's First Amendment right not to be coerced into waiving his First Amendment right not to speak to the government about events that took place outside prison walls.

219.     At ADX, Mr. Paredes-Machado ultimately agreed to hear out the government. Nevertheless, he remains incarcerated at ADX.

<u>The BOP and DOJ Singled Out Mr. Paredes-Machado and Treated Him Differently from Other Similarly Situated Inmates</u>

220.     In taking such drastic measures to coerce Mr. Paredes-Machado into speaking to the government, first by having him tortured and then by transferring him to ADX, the United States, the BOP, and the DOJ treated Mr. Paredes-Machado differently from similarly situated prisoners.

221.    The United States, the BOP, the DOJ, and Defendant Carvajal had no rational basis to justify transferring Mr. Paredes-Machado to ADX when similarly situated prisoners were not singled out for ADX transfer. The government's only basis was an illegal one: to coerce Mr. Paredes-Machado into waiving his First Amendment right not to speak to the government about events that occurred outside the prison.

222.    The United States, the BOP, and the DOJ believed Mr. Paredes-Machado was a "plaza boss."

223.    As detailed above, plaza bosses do not occupy the highest ranks of Mexican cartels.

224.    As detailed below, a survey of similarly situated cartel members incarcerated in federal prisons on drug trafficking-related charges stemming from cartel activities reveals that no other plaza bosses within cartel organizations have been transferred to ADX.

225.    José Antonio Torres-Marrufo, a plaza boss in the Sinaloa Cartel in Ciudad Juarez, Chihuahua, México was convicted of RICO continuing criminal enterprise in violation of 18 U.S.C., § 1962(d)(1); conspiracy to kill in a foreign government in violation of 18 U.S.C. § 956(a)(13); and kidnapping and aiding and abetting in violation of 18 U.S.C. §§ 1202 and 2(14) in case 3:12-cr-00849-FM-6 in the Western District of Texas. Mr. Torres-Marrufo was sentenced to 480 months imprisonment. Mr. Torres-Marrufo was placed in USP Atwater to serve his prison sentence. He was never designated notorious despite being convicted of a conspiracy to a kill, aiding and abetting in a kidnapping, and continuing a criminal enterprise. He was not sent to ADX.

226.    Juan Roberto Rincon-Rincon, a plaza boss in the Gulf Cartel, was convicted of conspiracy to possess with intent to distribute more than 5 kilograms of cocaine and more than 1,000 kilograms of marijuana in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(1); and conspiracy to import more than 5 Kilograms of cocaine and more than 1,000 kilograms of marijuana

in violation of 21 U.S.C. §§ 952(a), 960(a)(1) and (b)(1) ad 963(2) in case 1:12-cr-00005-1 in the Southern District of Texas. Mr. Rincon-Rincon was sentenced to life in prison. He was placed in USP Canaan. He was never designated notorious. Despite having been convicted of an 841(a)(1) offense like Mr. Paredes-Machado, he was not sent to ADX. Worse, Mr. Rincon-Rincon was convicted of additional conspiracy charges and sentenced to life in prison. Yet he was never singled out to endure the torturous isolation of ADX.

227.    Rafael Cardenas-Vela, a plaza boss in Matamoros, Tamaulipas, Mexico, was convicted of conspiracy to possess with intent to distribute more than 5 kilograms of a mixture of substance containing a detectable amount of cocaine and 1,000 kilograms or more of a mixture and substance containing a detectable amount of marijuana in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A) in case 1:11-cr-01022-1 in the Southern District of Texas. Mr. Cardenas-Vela was sentenced to 240 months in prison. Mr. Cardenas-Vela was placed in FDC Houston. He was never designated notorious. Despite being similarly situated as a plaza boss within a cartel and despite being convicted of the same 841(a)(1) offense as Mr. Paredes-Machado, he was not sent to ADX.

228.    Pedro Sanchez-Arras, a plaza boss for the Juarez Cartel, was convicted of attempt/conspiracy to import or export marijuana in violation of 21 U.S.C. § 963 in case 3:11-CR-00303-DB in the Western District of Texas. Mr. Sanchez-Arras was sentenced to 360 months in prison. Mr. Sanchez-Arras was placed in USP Lompoc, a medium security U.S. penitentiary. He was never designated notorious. Despite his similar status as a plaza boss for a cartel and despite having been convicted for drug trafficking activities and being sentenced to 96 more months than Mr. Paredes-Machado, he was not sent to ADX.

229.    None of these comparators, all similarly situated cartel plaza boss prisoners, were made to suffer the punishment Mr. Paredes-Machado suffered despite their identical hierarchical status within cartels and despite the similarity or greater seriousness of their convictions.

230.    No person who the government believed was a "plaza boss" has been sent to ADX, other than Mr. Paredes-Machado.

231.    This differential treatment is even more glaringly illustrated by comparing Mr. Paredes-Machado's treatment to the treatment of undeniably far more powerful and higher-ranking cartel members convicted of very serious offenses. At least 10 higher ranking cartel leaders accused of far more serious offenses, including crimes of violence, were never designated notorious and transferred to ADX.

232.    Miguel Angel Caro-Quintero, the former leader of the Sonora Cartel, was convicted of conspiracy to violate the RICO Act in violation of 18 U.S.C. §§ 1961, 1962, and 1963 for knowingly conspiring to participate in a pattern of racketeering activity including violations of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), knowingly possessing with intent to distribute and knowingly distributing more than 1,000 kilograms of a substance and mixture containing a detectable amount of Marijuana in case 1:2009-CR-367 in the District of Colorado. He spent 17 years in federal prison at USP Victorville. He was neither designated notorious nor sent to ADX.

233.    Alberto Benjamin Arellano-Felix, the former head of the Tijuana Cartel, was convicted of conducting affairs of an enterprise through pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(c), 982(a)(a), (b)(1), and 1963(a); and conspiracy to launder monetary instruments in violation of 18 U.S.C. §§ 371; 982(a)(1), (b)(1), and 1963(a), in case 97-CR-2520-LAB in the Southern District of California. Mr. Arellano-Felix was sentenced to a total of 25 years in

federal prison. This cartel head was placed in USP Lee. Despite being the head of a cartel, Mr.

Arellano-Felix was neither designated notorious nor sent to ADX.

234. Eduardo Arellano-Felix, the brother of Alberto Benjamin Arellano-Felix, was a drug

kingpin leader from the Tijuana Cartel, was convicted of conspiracy to launder monetary

instruments in violation of 18 U.S.C. §§ 371, and 982(a)(1), (b)(1); and conspiracy to use and invest

illicit drug profits in violation of 21 U.S.C. §§ 854(a), and 846 in case 97-CR-2520 in the Southern

District of California. Mr. Arellano-Felix was sentenced to a total of 15 years in federal prison. As a

drug kingpin he ranked higher than a plaza boss, but Mr. Arellano-Felix was placed in FCI

Allenwood, a low security prison. He was neither designated notorious nor transferred to ADX.

235. Juan Jose Quintero-Payan, the co-founder of the Juarez Cartel, was convicted of

RICO racketeering conspiracy in violation of 18 U.S.C. § 1962 in case 5:85-CR-00329-OLG-1 in the

Western District of Texas. He was sentenced to 222 months in federal prison. Despite being a cartel

founder, Mr. Quintero-Payan was neither designated notorious nor sent to ADX.

236. Cesar Alfredo Meza-Garcia, a former Tijuana Cartel leader, was convicted of

conspiracy to distribute cocaine and methamphetamine in violation 21 U.S.C. §§ 841(a)(1) and 846;

and 21 U.S.C. § 853 in case 3:12-CR-2414-WQH in the Southern District of California. Mr. Meza-

Garcia was sentenced to 300 months in prison. He was placed at FCI Yazoo City, a low security

federal prison. Mr. Meza-Garcia was neither designated notorious nor sent to ADX.

237. Edgar Valdez-Villareal was a high-ranking lieutenant in the Beltran-Leyva Cartel. He

was convicted of conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 846 and

841(b)(1)(A)(ii); conspiracy to import cocaine in violation of 21 U.S.C. §§ 963 and 960(b)(1)(B)(ii);

and money laundering conspiracy in violation of 18 U.S.C. § 1956(h) in case 1:09-CR-551-WSD-1 in

the Northern District of Georgia. Mr. Valdez-Villareal was sentenced to a total of 49 years in federal

prison and placed in USP Coleman 2. Mr. Valdez-Real, a higher-ranking cartel member than Mr. Paredes-Machado, was never designated notorious and transferred to ADX.

238.    Miguel Angel Corea-Diaz, a high ranking member of MS-13, was convicted of conspiracy to participate in a racketeering enterprise in violation of 18 U.S.C. § 1962(d); conspiracy to commit murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(5); murder in aid of racketeering aiding and abetting in violation of 18 U.S.C. § 1959(a)(1) and 18 U.S.C. § 2; conspiracy to distribute and to possess with intent to distribute controlled substances in violation of 21 U.S.C. § 846; and possession with intent to distribute controlled substance in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B) in case 8:17-cr-00382-PX-13 in the District of Colorado. Mr. Corea-Diaz was sentenced to life in prison. Mr. Corea-Diaz was placed in USP Lewisburg. He was neither designated notorious mor sent to ADX despite having been convicted of far more serious, violent offenses, and despite receiving a life sentence.

239.    Gilberto Rodriguez-Orejuela, leader of the notorious Colombian Cali Cartel, was convicted of conspiracy to import in excess of 5 kilograms of cocaine in violation of 21 U.S.C. § 963 in case in case 1:03-cr-20774-FAM-2 in the Southern District of Florida. He was sentenced to 30 years in federal prison. Mr. Rodriguez-Orejuela was placed in FCI Butner, a medium security federal prison. Mr. Rodriguez-Orejuela was neither designated notorious nor transferred to ADX despite playing a leadership role in a cartel responsible for importing over 200,000 tons of cocaine into the United States.

240.    Miguel Rodriguez-Orejuela, brother of Gilberto Rodriguez-Orejuela was also a leader of the notorious Cali Cartel. Mr. Rodriguez-Orejuela was convicted of conspiracy to import in excess of 5 kilograms of cocaine in violation of 21 U.S.C. § 963 in case 1:03-cr-20774-FAM-1 in the Southern District of Florida. He was sentenced to 30 years in federal prison. Mr. Rodriguez-Orejuela

was placed in FCI Loreto, a low security federal prison. Mr. Rodriguez-Orejuela was neither designated notorious nor transferred to ADX despite being a leader in a cartel responsible for importing over 200,000 tons of cocaine into the United States.

241.    Diego Leon Montoya-Sanchez, one of the leaders of the Columbian Norte del Valle Cartel and former FBI Top Ten Fugitive was convicted of conspiracy to import controlled substance in violation of 21 U.S.C. § 963 and injuring officer/juror/witness in case 1:99-CR-00804-CMA-4 in the Southern District of Florida. Mr. Montoya-Sanchez was sentenced to 49 years in federal prison. Mr. Montoya-Sanchez was placed in FCI Petersburg, a medium security federal prison. Despite his status as a Colombian cartel leader and placement on the FBI's Top Ten Fugitive list, Mr. Montoya-Sanchez was neither designated notorious nor transferred to ADX.

242.    Mr. Paredes-Machado's rank within the cartel was identical to the 4 plaza boss comparators listed above.

243.    Mr. Paredes-Machado's rank within the cartel was lower than the 10 other cartel leader and cartel head comparators described in the above paragraphs.

244.    No rational BOP official could regard the circumstances of Mr. Paredes-Machado to differ from those of the comparator prisoners to a degree that would justify such stark differential treatment.

245.    No rational BOP official could designate Mr. Paredes-Machado notorious so as to send him to ADX when drug lords and cartel heads sentenced to life in prison on violent drug trafficking conspiracies receive no such designation.

246.    Mr. Paredes-Machado was not transferred to ADX on the basis of a legitimate governmental policy.

247.    Instead, Mr. Paredes-Machado was transferred to ADX because the DOJ and its Defendant employees sought his transfer to coerce Mr. Paredes-Machado into giving the government information when the two sides met, and the BOP and its Defendant employees agreed to go along despite lacking a legitimate basis for doing so.

248.    The similarity in circumstances between Mr. Paredes-Machado and the other prisoners listed herein, and the difference in treatment Mr. Paredes-Machado experienced when he was tortured and then later sent to ADX, are sufficient to exclude the possibility that the Defendants acted on the basis of mistake.

249.    Rather, comparing Mr. Paredes-Machado, an otherwise unremarkable plaza boss who was not convicted of violent offenses, and the extreme punishment he received, to far more violent and higher-ranking members of international drug cartels who were never sent to ADX, makes clear that the government transferred Mr. Paredes-Machado to ADX to coerce him into speaking to the government.

250.    In singling out Mr. Paredes-Machado for draconian punishment vastly different from that meted out on similarly situated prisoners, the Defendants violated Mr. Paredes-Machado's right to Equal Protection and were the actual and proximate cause of this constitutional violation.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 5 U.S.C. § 702; *Bell v. Hood*; First Amendment
### Unconstitutional Coercion to Speak with the Government
### All Defendants

251.    Mr. Paredes-Machado incorporates all other paragraphs as if fully set forth herein.

252.    Mr. Paredes-Machado possesses a First Amendment right not to speak to the government concerning events that occur outside any prison facility.

253.    Mr. Paredes-Machado possesses a concomitant First Amendment right not to be coerced into waiving his First Amendment right not to speak to the government concerning events that occur outside any prison facility.

254.    The government initially set Mr. Paredes-Machado to serve his sentence at a low security prison based on their objective Inmate Security Designation and Custody Classification Guidelines. Mr. Paredes-Machado's low risk classification made him eligible for COVID-19 parole home confinement release. In fact, Mr. Paredes-Machado was in the COVID-19 parole home confinement release process until Defendants intervened, overriding BOP's normal procedures so as to send Mr. Paredes-Machado to ADX.

255.    To coerce Mr. Paredes-Machado into giving up his First Amendment right to not speak to the government about events that happened outside of prison walls, the Defendants orchestrated transferring Mr. Paredes-Machado to ADX, the most restrictive prison in America, a prison with conditions that amount to torture.

256.    This coercion violated Mr. Paredes-Machado's First Amendment rights.

**SECOND CLAIM FOR RELIEF**
**5 U.S.C. § 702; *Bell v. Hood*; First Amendment**
**Conspiracy to Engage in Unconstitutional Coercion to Speak with the Government**
**Defendants: Wininger, Gilmore, John Does #1 – #10, Facey, John Does #11 – #20**

257.    Mr. Paredes-Machado incorporates all other paragraphs as if fully set forth herein.

258.    These Defendants conspired to coerce Mr. Paredes-Machado into giving up his First Amendment right not to talk to the government about events that occurred outside of prison as detailed herein. Each Defendant agreed to participate in the plan and took active steps to assist the plan to have Mr. Paredes-Machado transferred to ADX so as to give the government increased

leverage over him in order to try to get him to talk to the government about events that had occurred outside of any prison.

259.     Each of these Defendants played a knowing and necessary role in executing the plan to coerce Mr. Paredes-Machado into giving up a right protected by the First Amendment.

## THIRD CLAIM FOR RELIEF
### 5 U.S.C. § 702; *Bell v. Hood*; Fifth Amendment; Equal Protection Clause
### Unconstitutional Disparate Treatment of Similarly Situated People
### Defendants: United States of America, United States Department of Justice,
### Federal Bureau of Prisons, Carvajal

260.     Mr. Paredes-Machado incorporates all other paragraphs as if already set forth herein.

261.     No rational BOP official could regard the circumstances of Mr. Paredes-Machado to differ from those of the comparator BOP prisoners described herein to a degree that justifies their differential treatment: transferring Mr. Paredes-Machado to ADX when (a) other similarly situated BOP prisoners were not transferred to ADX and (b) no similarly situated prisoners have been transferred to ADX.

262.     The similarity in circumstances between Mr. Paredes-Machado and the comparators listed herein, and the difference in treatment Mr. Paredes-Machado experienced when he was sent to ADX despite his BOP classification, are sufficient to exclude the possibility that the defendants acted on the basis of mistake.

263.     Instead, Defendants acted on an impermissible motive to place Mr. Paredes-Machado in as heinous a living situation as possible so as to extract information from him.

264.     In so doing, they denied him equal protection of the law.

## FOURTH CLAIM FOR RELIEF
### 5 U.S.C. § 552 – FOIA violation
### Defendants: Federal Bureau of Prisons, Carvajal

265.     Mr. Paredes-Machado incorporates all other paragraphs as if already set forth herein.

266.     On June 4, 2021, Mr. Paredes-Machado sent a letter to the Bureau of Prisons, run by Executive Director Carvajal, requesting records related to Mr. Paredes-Machado's reclassification and subsequent housing at ADX.

267.     On June 25, 2021, Defendants, by form letter, acknowledged receipt of Mr. Paredes-Machado's request. Defendants' form letter designated Mr. Paredes-Machado's request "complex" and informed him that processing it may take up to nine months.

268.     After almost year had gone by, on June 1, 2022, Mr. Paredes-Machado contacted Defendants' FOIA Liaison to request that the documents be produced within 20 working days.

269.     Defendants' only response was another form letter that provided no information concerning when or whether documents would be produced.

270.     Mr. Paredes-Machado has exhausted the applicable administrative remedies with respect to his FOIA request to Defendants.

271.     Over a year has gone by since Mr. Paredes-Machado made his FOIA request. Defendants are illegally withholding the documents he requested.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Paredes-Machado respectfully requests this Court enter judgment in his favor and against the Defendants, and award him all relief as allowed by law and equity, including, but not limited to:

Causes of Action 1-3

a) Issue a judgment declaring that the acts of Defendants described herein violated the U.S. Constitution as alleged herein;

b) Issue an injunction barring Defendants and their agents from further engaging in the unlawful acts described herein;

c) Order relief in the nature of mandamus compelling Defendants to (1) transfer Mr. Paredes-Machado out of ADX; (2) transfer Mr. Paredes-Machado to FCI Safford or a facility of comparable restrictiveness; and (3) process Mr. Paredes-Machado's application for home confinement under the standards for home confinement release that were in effect at the time his application was initially being considered, without interfering to prevent Mr. Paredes-Machado's release;

d) Award costs of suit and attorneys fees; and

e) Provide such other and further relief as the Court may deem just, proper, and appropriate.

Cause of Action 4

a) Issue a judgment declaring that Defendants have violated 5 U.S.C. § 552 by refusing to respond to the substance of Mr. Paredes-Machado's FOIA request;

b) Issue an injunction barring Defendants and their agents from further violating 5 U.S.C. § 552;

c) Order relief in the nature of mandamus compelling Defendants to provide the documents Mr. Paredes-Machado requested as provided for by 5 U.S.C. § 552;

d) Provide for expeditious proceedings;

e) Award costs of suit and attorneys fees; and

f) Provide such other and further relief as the Court may deem just, proper, and appropriate.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated: July 7, 2022

Adam Frank
Cameron Bedard
Frank Law Office LLC
1133 N Pennsylvania St.
Denver, CO 80203
Phone: (303) 800-8222
Fax: (303) 800-9122
adam@franklawoffice.com
cameron@franklawoffice.com

ATTORNEYS FOR PLAINTIFF